UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAYSON KOSZUTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 2679 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| OFFICE DEPOT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Jayson Koszuta ("Plaintiff") brings this action against his former employer, Office Depot, Inc. ("Defendant") alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (R. 38, Am. Compl.) Presently before the Court is Defendant's motion for summary judgment. (R. 85, Mot.) For the reasons stated below, the motion is granted.

## FACTS

Before turning to the facts, the Court must address Plaintiff's filings in response to the motion. As detailed herein, Plaintiff has elected to proceed *pro se* after being represented by three different attorneys in this case. Plaintiff has made this Court's task quite difficult by disputing nearly all of Defendant's proposed facts, even those pertaining to such benign matters as whether an email was sent or a meeting held on a particular date. (*See* R. 91-2, Pl.'s Resp. to Def.'s Facts.) In response to some proposed facts, he both admits and denies, often with lengthy and confusing explanations, arguments, and cross-references to other documents that he created for this litigation; some of his responses span more than a page of single-spaced type. (*See, e.g., id.* ¶¶ 15-17, 39.) It is also not clear that Plaintiff actually denies that emails were sent or that

meetings were held. Instead, it appears that he is trying to dispute the truth of statements made in the emails or has a different recollection of what occurred at a particular meeting. (*See id.*) Indeed, the voluminous exhibits he submitted with his response brief corroborate much of Defendant's account regarding the events leading to his termination. (*See* R. 91-3 to R. 91-7.)

In short, Plaintiffs' responses fail to comply with the Local Rules of this Court and have created a significant amount of confusion over the issues actually in dispute. *See* N.D. ILL. L.R. 56.1(b)(3) (providing that party opposing a motion for summary judgment must provide a "concise" response to each of movant's proposed facts); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("A litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court."); *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528-29 (7th Cir. 2000) (observing that the purpose of local rules like Rule 56.1—"to require the parties to identify the disputed issues in a concise format—would be defeated if the court were required to wade through improper denials and legal argument in search of a genuinely disputed fact"). The Court understands that Plaintiff is proceeding *pro se*, but even *pro se* litigants are required to comply with applicable procedural rules.[1] *McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (holding that "even *pro se* litigants must follow the rules of

---

[1] The Court notes that Plaintiff is an information technology professional with a masters-level education. (R. 88-1, Pl.'s Dep. Tr. at 32, 39.) All of his filings in this case have been lucid and well-written, and he has appeared several times before the Court, during which time he was articulate and zealously advocated for his position, achieving procedural victories in this case pertaining to discovery and other matters. The Court further notes that Plaintiff was provided the notice to *pro se* litigants required by Northern District of Illinois Local Rule 56.2, which included a plain-language explanation of how to respond to the motion for summary judgment, accompanied by a copy of the Local Rule itself. (*See* R. 89, Notice.)

civil procedure"). For these reasons, the Court must strike Plaintiff's responses to Paragraphs # 6-71. These proposed facts are deemed admitted. *See* N.D. ILL. L.R. 56.1(b)(3)(C).

Plaintiff's statement of additional facts suffers from the same infirmities. (*See* R. 91-1, Pl.'s Add. Facts.) Although technically he enumerated 40 paragraphs—the limit proscribed by the Local Rules—he includes multiple assertions of fact in each paragraph, and some paragraphs span as many as four single-spaced pages. (*See, e.g., id.* ¶¶ 15, 19, 20, 22.) His additional facts are also replete with improper arguments, hearsay statements, and cross-references to other documents he prepared for this litigation rather than to record evidence. Neither Defendant, nor this Court, can be expected to scour this 59-page, single-spaced document in search of potential fact disputes. Accordingly, Plaintiff's statement of additional facts is also stricken. *See* N.D. ILL. L.R. 56.1(b)(3)(C).

With these documents stricken, the Court would be within its discretion to limit its consideration solely to Defendant's Rule 56.1 statement. *See Bordelon*, 233 F.3d at 529. This action would be particularly warranted given that this is an employment discrimination case, as such cases are "by their nature extremely fact-intensive." *Bilal v. Rotec Indus., Inc.*, 326 F. App'x 949, 956 (7th Cir. 2009). However, in the interest of justice, the Court has considered the exhibits submitted by Plaintiff, including emails, company records, and deposition testimony, to determine whether there is an actual dispute of fact warranting a trial.[2] (*See* R. 91-3 to R. 91-7.)

---

[2] The Court also considers Plaintiff's "Factual Narrative" ("Narrative") and "Timeline of Events" ("Timeline") that he prepared for this litigation (*see* R. 91-3), to the extent they are based on his own personal knowledge, on the assumption that if this case proceeded to trial, Plaintiff could testify to these matters in Court. *See* FED. R. CIV. P. 56(c)(2) (providing that material submitted in connection with a motion for summary judgment is objectionable only if it "cannot be presented in a form that would be admissible in evidence"). The Court has disregarded any hearsay statements contained within those documents, which would be inadmissible at trial and thus cannot be used to defeat summary judgment. *See Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015) ("A [lay] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter[.]"); *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (holding that hearsay cannot be used to defeat summary judgment).

Turning now to the facts, Defendant hired Plaintiff in January 2006 as an IT Senior Developer at its Naperville, Illinois, headquarters. (R. 91-2, Pl.'s Resp. to Def.'s Facts ¶ 3.) In 2008, Plaintiff was promoted to Software Senior Engineer and then again to Software Lead Engineer, the position he held for the remainder of his employment. (*Id.*) In 2011, IT Senior Manager Christina Garcia became Plaintiff's direct supervisor. (R. 87, Def.'s Facts ¶ 7.) In 2012, Plaintiff went out on medical leave for approximately six months for mental health treatment.[3] (*Id.* ¶ 8.) He was released by his doctor and returned to work on January 4, 2013. (R. 91-3, Doctor's Note at 159.) He did not go back to his doctor for treatment after his return to work. (R. 87, Def.'s Facts ¶ 9; R. 88-1, Pl. Dep. Tr. at 60-61.)

In addition to his IT work, Plaintiff had a significant interest in what he refers to as a "unity" theory, which he describes as a "social cause that promotes think[ ] tanks of ideas of different trustworthy people that unite together on a common ground to come up with brilliant ideas." (R. 91-3, Pl.'s Narrative at 103.) Among other things, he had a blog that he was "working on for unity and technology, to . . . basically throw ideas out there about the broken legislative system or whatever[.]" (R. 88-1, Pl. Dep. Tr. at 72-73.) He also had business cards made up listing his website, and on at least one occasion handed a card out to a coworker. (*Id.* at 72-73.) Additionally, he had a number of pictures and other materials hanging in his cubicle related to his unity theory. (*See* R. 91-3, Pl.'s Narrative at 90-91.)

During November 2013, Defendant was in the process of merging with OfficeMax, Inc. (R. 91-2, Pl.'s Resp. to Def.'s Facts ¶ 4.) On November 7, 2013, an incident occurred between Plaintiff and one of his coworkers, Dave Records, after which Plaintiff complained to Garcia that Records had called him an "asshole." (R. 87, Def.'s Facts ¶ 13; R. 91-3, Pl.'s Timeline at 9; R.

---

[3] By Plaintiff's own account, he was suffering from severe insomnia, paranoia, and depression, for which he received both inpatient and outpatient treatment. (*See* R. 91-3, Pl.'s Narrative at 85-86; *id.*, Doctor's Progress Note at 157.)

88-1, Pl. Dep. Tr. at 50.) Garcia later met with human resources ("HR") employee Yolanda Hawthorne to discuss the incident.[4] (R. 87, Def.'s Facts ¶ 15.) Garcia reported to Hawthorne that, when making his complaint to her about Records, Plaintiff had raised his voice and leaned towards her in a way that made her feel uncomfortable, and that he had engaged in similar conduct on other recent occasions. (*Id.* ¶¶ 12-13.) Hawthorne then spoke with Plaintiff about the incident. (R. 88-2, Hawthorne Meeting Notes at 6-7.) As she recalled the conversation, Plaintiff informed her that he had been "on antidepressants, but he told his doctor that he didn't like the way they made him feel [and] with that in mind he took himself off the meds." (*Id.* at 6.) Plaintiff has a slightly different recollection of their conversation. He claims that he told Hawthorne not that he had recently discontinued his medications, but that he had been "able to come back to work [after his medical leave] without the need of being on any medication."[5] (R. 91-3, Pl.'s Timeline at 10.) There is no dispute, however, that as a result of that meeting, Hawthorne was aware that Plaintiff was not taking any medications despite having been on an extended leave for mental health reasons less than a year earlier.

On November 13, 2013, Plaintiff attended a follow-up meeting with Hawthorne and Wanda Rodriguez, another HR employee. (R. 87, Def.'s Facts ¶ 16; R. 91-3, Pl.'s Timeline at 11.) At that meeting, Plaintiff read aloud from a document he had prepared stating, among other things, that he was being "bullied" by Garcia. (R. 87, Def.'s Facts ¶ 17.) Plaintiff later emailed Hawthorne and Rodriguez the eight-page document he had been reading from, which stated in part that Plaintiff was a "solution provider" who was "just overwhelmed with the opportUNITY

---

[4] According to documents produced in discovery, Records was issued a verbal reprimand for this incident on November 21, 2013, requiring him, among other things, to "extend a formal face to face apology to [Plaintiff]" and another employee who was present during the incident. (R. 91-5, Records Mem. at 7.)

[5] During his deposition, Plaintiff was asked if his psychiatrist had approved him to stop taking medication for depression, and he responded, "I don't remember." (R. 88-1, Pl.'s Dep. Tr. at 60.) It is undisputed that he never returned to the doctor for further treatment after he came back to work in January 2013. (R. 87, Def.'s Facts ¶ 9; R. 88-1, Pl.'s Dep. Tr. at 60-61.)

to spread unity it just cannot be described in words." (*Id.* ¶ 18; R. 88-2, Pl.'s Email at 29.) He further stated that "[e]liminating the dividers and promoting the Uniters," was a "key fundamental," and he identified Garcia and Records as "Dividers not Uniters[.]" (R. 88-2, Pl.'s Email at 30.)

On that same day, Hawthorne interviewed four of Plaintiff's co-workers—Leilani Gandia, Cheng Zhang, Meera Dugar, and Records—as part of an investigation into Plaintiff's allegations of being "bullied" by Garcia, as well as Garcia's reports of Plaintiff's unusual behavior. (R. 87, Def.'s Facts ¶ 19; R. 88-2, Meeting Notes at 25-26.) Gandia and Records both corroborated Garcia's report that Plaintiff frequently spoke about his "unity" theories during work. (R. 87, Def.'s Facts ¶ 22.) Zhang said she did not want to work with Plaintiff, and Gandia requested that she be allowed to work from home in order to avoid interacting with Plaintiff. (*Id.* ¶ 23.) Gandia documented her experiences in an email, originally sent to Garcia and then forwarded to Hawthorne. (R. 88-2, Gandia Email at 9-12.) Among other things, she described a recent incident wherein Plaintiff had "aggressively cut off [Zhang]" during a meeting, another incident where he was "aggressive" toward Records, and another incident wherein Plaintiff had been talking to Gandia about his unity theory and his "eyes looked bloodshot" and he "didn't really [look] so good." (*Id.* at 9-10.) Gandia also reported that after another recent meeting, she saw Plaintiff walking back to his desk "pointing both index fingers in the air saying 'unity.'" (*Id.* at 11.) Zhang and Dugar also both reported that Plaintiff had engaged in aggressive or disruptive behavior in recent months. (R. 87, Def.'s Facts ¶ 21.) Zhang similarly documented her experiences in an email, originally sent to Garcia and later forwarded to Hawthorne, in which she described how during a recent meeting Plaintiff had acted "aggressively" and spoke "loudly," causing a "tense" atmosphere. (R. 88-2, Zhang Email at 16.) Zhang stated that she had a similar

experience with Plaintiff a month earlier, when she was speaking during a meeting and he began "yelling [at] me with [an] angry face." (*Id.*)

Later on November 13, 2013, Defendant's new Chief Executive Officer ("CEO"), Roland Smith, held a town hall meeting with the entire corporation, consisting of several hundred employees. (R. 87, Def.'s Facts ¶ 24.) During the meeting, Plaintiff asked Smith a lengthy question pertaining to his unity theory, stating in part:

> Think of the last five letters of opportunity. There is a huge opportunity for unity and I truly feel if we can convert the fighters, reduce the politics, put our best foot forward on every question, solution, design, and agree to disagree, we're gonna get to the finish line a lot faster. So I don't know your thoughts, all your core values, they basically breathe unity. I didn't hear you say the word, but I feel it. It's an exciting time. I just want to know . . . is there a unity committee? Is there something that could be put in place to help facilitate unity?

(R. 91-5, Town Hall Meeting Tr. at 15.)

On November 15, 2013, Garcia reported to HR senior manager Ronda Aimi that Plaintiff had acted in a threatening and aggressive manner toward her. (R. 87, Def.'s Facts ¶ 27.) She stated that Plaintiff had mocked her and, while leaning toward her in a manner that made her uncomfortable, told her that "things were going to change." (*Id.* ¶ 28.) Aimi observed that Garcia was crying and visibly trembling when she made this report to HR. (*Id.* ¶ 30.) Plaintiff denies that he ever acted in a threatening or aggressive manner toward Garcia, and claims that this was a "big crying story" concocted by Garcia and her "loyal circle." (R. 88-1, Pl.'s Dep. Tr. at 61, 68.)

As a result of these events, on November 15, 2013, Aimi determined that Plaintiff should be escorted out of the building and placed on leave. (R. 87, Def.'s Facts ¶ 31.) Charlie Baugh, a vice president, was the one to actually escort Plaintiff out of the building. (R. 88-1, Pl.'s Dep. Tr. at 68.) Plaintiff initially refused to leave the building when Baugh asked him to, but later agreed to leave. (*Id.*) According to Plaintiff, Baugh made a rude comment to him on the way out,

stating, "What, were you going to jump?" when Plaintiff accidentally got off the elevator on the second floor. (*Id.* at 89.) Baugh also gave Plaintiff a brochure about an employee assistance website, "liveandworkwell.com," which provided mental health and other self-help information. (*Id.* at 90; R. 91-5, Brochure at 105-07.)

The following day, HR employees Aimi, Hawthorne, and Rodriguez had a telephone conference with Plaintiff. (R. 87, Def.'s Facts ¶ 32.) During the call, Plaintiff again complained about Garcia, including making allegations that she had brought in relatives and friends to work for Defendant in violation of the company's conflict-of-interest policy. (*Id.* ¶ 33; R. 88-2, Meeting Notes at 48-50.) On November 21, 2013, Plaintiff sent a lengthy email to Aimi's boss, Steve Parsons, complaining about his treatment by Garcia and Baugh, and claiming that Aimi and other HR staff had treated him unfairly and only wanted to "try and cover up the problem instead [of] addressing the root cause[.]" (R. 91-5, Parsons Email at 31-32.) He stated that he had written a "50+ page confession to defend my integrity that I am not the problem but am extending my unity hand to you to work with you to solve the problem." (*Id.*)

On November 22, 2013, Aimi emailed Plaintiff a letter detailing Defendant's concerns about his workplace behavior. (R. 91-5, Aimi Letter at 9-10.) Among other things, the letter stated that Plaintiff had "yelled at, interrupted and intimidated work colleagues," and that he had been "talking with many associates about your fixation with a theory of Unity that you appear to apply both to work and government matters." (*Id.* at 9.) The letter stated, "You have been observed by numerous people walking around the . . . building with one or both index fingers in the air, which you have indicated is a message for this theory." (*Id.*) The letter further stated that Plaintiff's behavior at the recent town hall meeting had been "extremely unusual and inappropriate," and that he "effectively took control of the meeting for an extended period of

time, attempting to communicate about your personal views about [his] Unity theory when this was a first opportunity for all OfficeMax associates to meet their new CEO." (*Id.*) The letter went on to state:

> It is nearly impossible to have a rational conversation with you about your impact on the work environment. Anyone who questions you or challenges a proposition you present is labeled as a divider or a fighter who must be "eliminated." You even say that some are the "forces of evil." While you present yourself as the victim of bullying, the consensus of those with whom you work is that your behavior is bullying. Some of them, frankly, are scared of you.

Aimi then stated that since returning from his extended medical leave Plaintiff had "conducted [himself] well for the most part," but that in the past few months he appeared to be in a "downward spiral." (*Id.*) Aimi also noted that Plaintiff had told a member of the HR staff that he was not taking any medications. (*Id.*) The letter then stated:

> We need help to sort this out. We are not experts, but we are very concerned, based on the facts we have collected, that you currently may not be able to properly interact with others as is required to do your job. We intend to seek the assistance of an independent medical consultant to evaluate your fitness for duty. We need to consult with advisors to determine a professional to provide this service. We hope to do this as quickly as possible. You will remain on paid leave at least through the holiday week. We will update you on our progress to put this assessment in place, with an ultimate goal of finding a way to return you to work.

(*Id.* at 10.) The letter also expressed concerns that Plaintiff may have been recording his phone conversations with Aimi and other HR staff after he was placed on leave; Aimi stated that Defendant "absolutely prohibits surreptitious recording of conversations, and Illinois law requires consent of all parties as well." (*Id.*) At the close of the letter, Aimi stated that "given what you say about the leaders in your organization, you cannot be happy with your job." (*Id.*) She offered to discuss a separation package with Plaintiff if he was interested, and stated that she was available to answer any questions he might have. (*Id.*)

That same day, Plaintiff responded to Aimi by email, stating, "I strongly disagree with the majority of what you have to say." (R. 88-2, Pl. Email at 56.) He stated that he was awaiting a response from Parsons because "you and your staff ha[ve] provided me without one ounce of trust and I will be sure Roland Smith president and CEO is aware of this." (*Id.*) He stated further, "This attempt for you to bully me once again is uncalled for, so this will be discussed with him as well." (*Id.*) On November 25, 2013, Plaintiff sent an email spanning 10 single-spaced pages to Smith, Defendant's new CEO, responding in detail to Aimi's letter and raising numerous allegations against Garcia, Baugh, Aimi, and others within the company. (R. 91-5, Pl.'s Email at 17-28.) Within the email, Plaintiff asked Smith to "take a minute . . . and listen to this very meaningful song that has been my inspiration over the past 2 weeks[.]" (*Id.* at 18.) He included a link to a YouTube video. (*Id.*)

On November 26, 2013, Parsons responded to Plaintiff's earlier email, telling him that he had been in communication with Aimi and that "your situation . . . is not as one-sided as you describe." (R. 91-5, Parsons Email at 30.) Parsons expressed "concern that you do not at least see the other side(s) to the issues you have raised or how other associates may perceive you." (*Id.*) Parsons encouraged Plaintiff to "continue working" with Aimi, and stated that Aimi "remains willing to facilitate your return to work, subject to the conditions she has outlined for you." (*Id.*)

On November 27, 2013, Aimi sent Plaintiff an email requesting "input" from him "to determine a solution to [his] current employment status." (R. 87, Def.'s Facts ¶ 37; R. 91-5, Aimi Email at 35.) She further stated that Defendant remained "willing to continue your pay through the end of the current work week. However, that will end at the conclusion of this work week. We would entertain resuming your pay if we are able to have a fitness for duty examination scheduled promptly." (R. 91-5, Aimi Email at 35.) That same day, Plaintiff responded by email,

stating that he would "have to pursue a team of non-biased trustworthy people outside the organization to work with on solving this problem of me being the victim." (R. 91-5, Pl. Email at 35.) Plaintiff refused to agree to a fitness-for-duty exam or provide a physician's note stating that he was fit for duty because he believed this request was "not justified," and that there was "no need" for him to undergo an exam. (R. 88-1, Pl.'s Dep. Tr. at 47, 75.)

On December 23, 2013, Aimi sent Plaintiff an email stating, "It has been a while since we have talked. We would like to come to a resolution. I understand you are unwilling to do what we had asked of you." (R. 87, Def.'s Facts ¶ 42; R. 91-5, Aimi Email at 37.) Aimi suggested discussing a separation package as "the most sensible outcome" and informed Plaintiff that she was available to talk by phone that day or the following day. (R. 91-5, Aimi Email at 37-38.) Plaintiff responded by email that same day and accused Aimi of making "direct false accusations" against him. (*Id.*, Pl. Email at 37.) He stated that he disagreed that a separation package "is the most sensible outcome here because you have proven nothing of such." (*Id.*) He closed by stating that he had been in contact with "another senior level HR representative" because he felt that "this person will be able to establish a stronger level [of] trust that is truly required among two parties when working to solve any complicated problem." (*Id.*)

On December 24, 2013, Aimi emailed Plaintiff again, this time informing him that the headquarters for the newly-merged company would be in Boca Raton, Florida, and that the Naperville building would likely be closing in the next 12 to 18 months, rendering full-time associates from that office "severance eligible." (R. 87, Def.'s Facts ¶ 45.) On January 2, 2014, Plaintiff filed a charge of discrimination with the Equal Employment and Opportunity Commission ("EEOC"). (R. 91-3, EEOC Charge at 175.) He alleged that he had been discriminated against because of his sex in violation of Title VII. (*Id.*)

On January 8, 2014, Plaintiff sent an email to Karen Barber, Senior Manager of Associate Relations, demanding a face-to-face meeting with Smith, the CEO, to "put an end to this nonsense[.]" (R. 87, Def.'s Facts ¶ 47; R. 91-5, Pl. Email at 41.) He further stated, "[L]et's . . . quit playing childish games like the immature leaders that got me in this position in the first place." (*Id.*) He also demanded the name of her superior. (*Id.*) Barber responded to Plaintiff later that same day, attaching the company's "Open Door Policy" and explaining that the policy did provide Plaintiff with the right to a face-to-face meeting with the company's CEO. (R. 91-5, Barber Email at 41.) She stated that she "remained willing to try to come to a resolution" of the issue and gave Plaintiff the name of her manager, Allison Stein, pursuant to his request. (*Id.*) Plaintiff responded to Barber that same day, again requesting to have his concerns about the "unprofessionalism" and "untrustworthy" conduct of Garcia, Records, Hawthorne, and Aimi heard by Smith. (*Id.*, Pl. Email at 40.) He closed by stating, "I am dedicated as a best in class solution provider to solve this problem effectively and in a timely manner due to the urgency in my details of emails and pointless conversations with the wrong people and would like to have it escalated to the man in charge immediately." (*Id.*)

On January 15, 2014, Plaintiff called Defendant's "ethics and compliance" hotline to submit complaints about having been placed on leave and claiming that Stein, Barber, and Smith had "continuously ignored his attempts in trying to resolve this matter." (*Id.*, Ethics and Compliance Hotline Notes at 49-54.) On January 16, 2014, Plaintiff sent Stein an email complaining that Barber had failed to, in his words, "provide efforts to me of [Defendant's] neglect in not supporting an innocent victim who was plagued viciously by a few individuals and was attacked viciously and had false accusations made directly at him which infected him personally and professionally by uncaringly defaming my character to support one lying

deceitful employee Mrs. Christina Garcia Scott." (*Id.*, Pl. Email at 56.) He stated that he was available to speak with Stein "if you feel you are a trustworthy non-biased individual who believes in respect and honest communication[.]" (*Id.*)

Later that same day, Barber emailed Plaintiff to "encourage you to re-consider your decision to refuse consideration and further discussion of the options you were presented, and to communicate collaboratively by January 31 to effect a resolution." (R. 87, Def.'s Facts ¶ 52; R. 91-5, Barber Email at 62.) She stated that Defendant remained "willing to discuss with you either of the options the company has proposed[.]" (R. 91-5, Barber Email at 62.) She informed him that "the formation of the IT organization structure and strategy, including decisions related to associates working in our Naperville office, will be finalized within a few weeks," and advised him that "if you fail to accept either option by January 31, your exit from the company will be administered in accordance with established guidelines and along a timeline for other associates impacted by position eliminations due to the headquarters relocation." (*Id.*) Later that same day, Plaintiff responded to Barber by email, stating that the "issue has already been escalated to your manager Allison Stein which was a result of you ignoring me after I gave you 1 full week to accommodate my needs as a violated valued associate." (*Id.*, Pl. Email at 65.)

On January 17, 2014, Stein sent Plaintiff an email stating that she understood Plaintiff had previously been given "two options: to secure a fitness for duty certificate or a separation package, and that you have two weeks to decide which option you would like (i.e., by January 31, 2014)." (R. 87, Def.'s Facts ¶ 57; R. 91-5, Stein Email at 67.) She further stated, "Please keep in mind that with the headquarters move to Boca, even if you return to work now with the fitness for duty certificate, your job will likely end in the near future. I understand that you wish

to be paid for the time that you have already lost; we can certainly discuss that as part of the separation package." (R. 91-5, Stein Email at 67.)

Within an hour of this email, Plaintiff sent a lengthy response to Stein complaining that the staff members who had been handling his complaints were "[a]ll women," and claiming that he had "not experienced one trustworthy respectable individual" when dealing with this "terrible issue." (*Id.*, Pl. Email at 75-76.) He also complained about Barber and the "ridiculous leadership" within the HR department. (*Id.* at 75.) He referred to himself repeatedly in the third person, and in describing the day he was escorted out of the building, stated, "Jayson Koszuta gets kicked out of the organization for absolutely no reason by the most unethical risk of a personality that I have ever seen grace the hallway of any organization I have been part of pre-school thru Office Depot." (*Id.* at 75.) He closed by stating:

> Jayson Koszuta apologizes for assertiveness especially to the point of style Jayson Koszuta had to write this email but has gotten to the point of trying anything to try and get someone to treat me simply as a human that has been violated to the extreme and is willing to find that Hero and promote that person as ONE Hero instead of promoting some many within this organization as Zeros. The choice is yours Allison Stein you go ahead now and make the right choice Jayson Koszuta knows that you can do it.

(*Id.* at 76.) Nowhere in this email did he offer to undergo a fitness-for-duty examination. (*See id.* at 75-76.)

At that point, Stein determined that "the interactive process had been exhausted." (R. 88-3, Stein Aff. ¶ 12.) On January 22, 2014, Stein sent Plaintiff an email stating, "Although [Defendant] had originally offered you the opportunity to return to work after a fitness for duty exam, this is no longer an option. In the eight weeks you have been away from work, we have had a change in IT leadership, restructuring of the POS group that you previously worked in, and are now transitioning much of the work from Naperville to Florida. In light of these changes . . .

the new leadership does not believe it makes sense to re-introduce you into the group." (R. 91-5, Stein Email at 85.) She advised that his employment would be terminated effective January 25, 2014. (*Id.*) She informed Plaintiff that she was attaching a draft release for his review, and stated that if he signed the release he would be paid $47,781.66, representing eight weeks of pay for the time he was on leave plus the equivalent of 16 weeks' severance. (*Id.*) The release required in part that Plaintiff dismiss his pending EEOC charge. (*Id.* at 86.)

Later that evening, Plaintiff responded to Stein, and copied Smith, with an email beginning with the statement, "I am NOT interested in signing that agreement you presented in the attachment you provided in the last email as I disagree with the wording and its purpose and I have a sick feeling in my stomach while I read each word." (*Id.*, Pl. Email at 94.) He complained that he had been "bending over backwards with a very attacker biased, disrespectful HR organization that has continued the bullying of me[.]" (*Id.* at 94.) Within the email he stated, "I want to know exactly what the fit for work exam consists of to see if it is even fair for me to do since the level of trust has been 0 from my perspective[.]" (*Id.* at 95.) He also complained that he had not been given information about the investigation into his allegations against Garcia. (*Id.*) He closed the lengthy email with a paragraph complaining about Smith, who he said had "disrespected me professionally by not giving me one word of attention in such a difficult issue that I was buried in for no reason as it was escalated to him 2 times for perfectly respectable escalation reasons[.]" (*Id.*)

On January 23, 2014, Stein responded to Plaintiff by email, informing him that "[r]eturning to work is no longer an option. [Defendant] told you 8 weeks ago that you could return with a fitness for duty certificate. After waiting eight weeks for you to provide the certificate, it no longer makes sense to return you." (*Id.*, Stein Email at 98.) She reiterated that

Plaintiff would be terminated effective January 25, 2014. (*Id.*) As to his request for information about the investigation into alleged wrongdoing by Garcia, Stein responded:

> In regard to the investigation, your concerns were thoroughly investigated and numerous people were interviewed. Based on what we learned, we took appropriate action. Out of consideration for the other associates involved in the investigation, I cannot provide you further details about what witnesses said, and/or whether other associates received corrective action.

(*Id.*)

Stein was the one who made the decision to terminate Plaintiff, and she attests that her decision was based upon Plaintiff's failure to undergo a fitness-for-duty examination during the eight-week period he was on leave, coupled with changes to his department resulting from the merger. (R. 88-3, Stein Aff. ¶¶ 12-13.) Stein was aware of Plaintiff's EEOC complaint at the time of Plaintiff's termination, but she attests that it did not factor into her decision. (*Id.* ¶ 15.)

On January 30, 2014, Defendant sent Plaintiff a letter confirming his termination. (R. 87, Def.'s Facts ¶ 70; R. 91-5, Termination Letter at 104.) The letter stated as follows:

> Jayson you were removed from our workplace on November 15, 2013, after safety concerns associated with your presence in the workplace arose. You were informed that you could return to work after a fitness for duty review. You refused to participate in a fitness for duty evaluation.
>
> After you were removed from the workplace, decisions were made which resulted in the decision to close your former workplace. Only in mid-January 2014 did you suggest you might participate in a fitness for duty evaluation. However, with the decision to close your worksite and decisions in the interim that affected the volume of work for your team, your services are no longer needed. You were offered an appropriate separation arrangement as a part of your separation.
>
> You received direct deposit on January 17th for 23.81 hours of [paid leave] in the amount of $937.46 and you will receive 40 hours of [paid leave] carryover on January 31st in the amount of $1,502.39. This information was communicated to

you previously, via email, at the time of your separation. Your termination was effective January 24, 2014.[6]

(R. 91-5, Termination Letter at 104.)

On February 13, 2014, Plaintiff filed a second charge with the EEOC, this time alleging that he had been fired in retaliation for filing his first EEOC complaint, and that Defendant had discriminated against him under the ADA by requiring him to undergo a fitness-for-duty exam based on a perceived disability. (R. 91-3, Second EEOC Charge at 179.) The EEOC found "reasonable cause" to believe that Defendant had violated the ADA and Title VII and engaged in an informal conciliation process with Defendant. (*Id.*, EEOC Determination at 181-82.) After that process proved unsuccessful, the EEOC issued Plaintiff a right-to-sue letter. (*Id.*, Right-to-Sue Letter at 184-85.) He then filed this action.

Documents produced in discovery show that while Plaintiff was out on leave, Defendant conducted an investigation into the allegations Plaintiff had raised against Garcia. (*See* R. 91-4, HR Incident Form at 20-21.) On January 10, 2014, Garcia was terminated after it was determined that she had violated the company's conflict-of-interest policy by hiring a relative, Don Kopkowski, without disclosing their relationship.[7] (*Id.* at 21; *id.*, Garcia Termination Letter at 47.) That same month, Kopkowski was also fired, as was Gandia, who was found to have falsely stated on a referral form that she knew Kopkowski prior to his employment. (R. 91-4, HR Incident Forms at 23-31; R. 91-6, Gandia Dep. Tr. at 30.)

---

[6] Although Stein previously stated that Plaintiff's termination would be effective January 25, 2014, that day was actually a Saturday. It appears that Defendant corrected this error by the time the formal termination letter was sent, making Plaintiff's termination effective Friday, January 24, 2014.

[7] Documents produced in discovery show that Garcia had been previously disciplined for hiring her cousin to work as a contractor, and for being involved in an intimate relationship with her supervisor, Jeff Scott, without disclosing either relationship. (R. 91-4, HR Incident Forms at 38-41, 46.) After Garcia's relationship with Scott was disclosed, Defendant changed the structure of the IT department so that Garcia would report to another employee. (*Id.*) According to Plaintiff, Scott and Garcia later married, and several of Plaintiff's coworkers attended the wedding, although Plaintiff did not. (R. 91-3, Pl.'s Narrative at 39-41.)

## PROCEDURAL HISTORY

On February 29, 2016, Plaintiff filed a *pro se* complaint alleging employment discrimination. (R. 1, Compl.) This Court subsequently granted his request for the appointment of counsel and recruited *pro bono* counsel to represent him. (R. 5, Mot.; R. 8, Order.) That attorney later sought, and was granted, leave to withdraw. (R. 15, Order.) The Court then recruited a second attorney to represent Plaintiff, who also later sought, and was granted, leave to withdraw. (R. 15, Order; R. 25, Mot.; R. 28, Order.) Plaintiff then retained an attorney to represent him, and that attorney filed an amended complaint on his behalf, which remains the operative pleading in the case. (R. 29, Appearance; R. 38, Am. Compl.) In Count I, Plaintiff alleges that Defendant violated Title VII by firing him in retaliation for filing an EEOC complaint. (R. 38, Am. Compl. ¶¶ 22-31.) In Count II, Plaintiff alleges that Defendant violated the ADA by placing him on leave and requiring him to undergo a fitness for duty examination "because [Defendant] regarded him as disabled." (*Id.* ¶¶ 35-36.) Plaintiff's third attorney was also later granted leave to withdraw, and since December 2016, Plaintiff has been proceeding in this matter *pro se*. (R. 55, Mot.; R. 57, Order.)

After the close of discovery, Defendant moved for summary judgment on both claims in the amended complaint. (R. 85, Def.'s Mot.; R. 86, Def.'s Mem.) Defendant argues that Plaintiff's ADA claim fails because Defendant was justified in placing Plaintiff on leave and asking him to undergo a fitness-for-duty examination given the circumstances. (R. 96, Def.'s Mem. at 6-14.) Defendant further argues that Plaintiff's retaliation claim fails because Defendant was justified in terminating Plaintiff based on his failure to undergo a fitness-for-duty examination for eight weeks, coupled with changes within the corporation during that period; Defendant argues that there is a lack of evidence to suggest a causal connection between

Plaintiff's EEOC charge and his termination. (*Id.* at 14-17.) Plaintiff filed a response brief, accompanied by voluminous exhibits, opposing the entry of summary judgment. (R. 91, Pl.'s Resp.; R. 91-1, Pl.'s Add. Facts; R. 91-2, Pl.'s Resp. to Def.'s Facts; 91-3, Exhibits.) Thereafter, Defendant filed a reply in support of its motion. (R. 92, Def.'s Reply; R. 93, Def.'s Resp. to Pl.'s Add. Facts.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of

an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in his favor." *Id.* (citation and internal quotation marks omitted).

Although the non-moving party is entitled to the benefit of favorable inferences, this only refers to "*reasonable* inferences, not every conceivable one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014) (emphasis added). The Court's "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citation, internal quotation marks, and alteration omitted). In addition, the Court can only consider evidence that would be admissible at trial. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). "The evidence need not be admissible in form, but must be admissible in content[.]" *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). Not all factual disputes will preclude the entry of summary judgment—only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In other words, "[i]rrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Fenje v. Feld*, 301 F. Supp. 2d 781, 788 (N.D. Ill. 2003) (citation omitted).

The Court is also not permitted to weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's sole function is "to determine

whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)

(quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

### I.    ADA Discrimination

Plaintiff first claims that Defendant discriminated against him under the ADA by

removing him from the workplace and requiring him to undergo a fitness-for-duty examination

on the basis of a perceived mental disability. (R. 38, Am. Compl. ¶¶ 32-39.) Defendant argues

that summary judgment is appropriate on this claim because, under the circumstances, Defendant

was justified in taking the actions that it did. (R. 86, Def.'s Mem. at 10-14.)

The ADA prohibits employers from discriminating against a "qualified individual"

because of a disability. 42 U.S.C. § 12112(a); *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495,

503 (7th Cir. 2017). To survive summary judgment "a plaintiff must show a genuine issue of

material fact exists regarding whether his disability was the 'but for' reason" for an adverse

employment action. *Monroe*, 871 F.3d at 504. "To show that disability discrimination was the

'but for' reason" for an adverse employment action, "a plaintiff can use either direct or

circumstantial evidence." *Id.* Direct evidence would be an admission that the defendant took the

adverse employment action "on the basis of [the employee's] disability." *Id.* Circumstantial

evidence may include:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other
> employees in the protected group; (3) evidence, statistical or otherwise, that
> similarly situated employees outside of the protected group systematically receive
> better treatment; and (4) evidence that the employer offered a pretextual reason
> for an adverse employment action.

*Id.* (citation omitted). "Evidence must be considered as a whole, rather than asking whether any

particular piece of evidence proves the case by itself[.]" *Ortiz v. Werner Enters., Inc.*, 834 F.3d

760, 765 (7th Cir. 2016). Summary judgment is not appropriate if the plaintiff presents a

"convincing mosaic of circumstantial evidence from which a factfinder can make a reasonable inference of discriminatory intent." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013) (citation and internal quotation marks omitted).

If the plaintiff establishes a *prima facie* case of discrimination under the ADA, the burden shifts to the employer to "offer a legitimate non-discriminatory reason for the employment decision." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 839 (7th Cir. 2012). If the employer succeeds in doing so, the burden shifts back to the plaintiff to show that there is a genuine dispute of material fact "that the proffered reason for the employment action is pretextual." *Id.* (citation omitted). To establish pretext, the plaintiff must "present evidence suggesting that the employer is dissembling." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (citation omitted). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain" its actions. *Id.* (citation omitted). In other words, "it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* (citation, internal quotation marks, and alteration omitted). To raise a factual dispute about whether the employer's stated justification is pretextual, the plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [the employer's] asserted reason that a reasonable person could find [it] unworthy of credence." *Id.* (citation, internal quotation marks, and alteration omitted).

Plaintiff here is proceeding under the "regarded as disabled" component of the ADA. (*See* R. 38, Am. Compl. ¶ 35 ("Defendant regarded Jayson as having a disability when, for example, it repeatedly told him he suffered from a mental disorder and was requiring him to

undergo a fitness for duty examination and obtain a certification from said medical health professional that Jayson was fit for duty.").) The "regarded as" component "provide[s] a remedy for discrimination based on misperceptions about the abilities of impaired persons." *Krocka v. City of Chicago*, 203 F.3d 507, 513-14 (7th Cir. 2000). As the U.S. Court of Appeals for the Seventh Circuit has explained:

> Many impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence. Such people, objectively capable of performing as well as the unimpaired, are analogous to capable workers discriminated against because of their skin color or some other vocationally irrelevant characteristic.

*Id.* at 514 (citation and internal alteration omitted). To prove a claim under the "regarded as" prong, it is necessary to show that the employer "entertain[ed] misperceptions about the individual." *Id.* (citation omitted). "These misperceptions may take the form of believing either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment, when, in fact, the impairment is not so limiting." *Id.* (citation and internal quotation marks omitted).

The ADA also prohibits employers from requiring a medical examination or inquiring into whether an "employee is an individual with a disability or as to the nature or severity of the disability," unless "such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(1), (d)(4)(A). "[A] medical examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009). "[W]here inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of

employees, the employer may, depending on the circumstances of the particular case, require specific medical information from the employee and may require that the employee undergo a physical examination designed to determine his ability to work." *Krocka*, 203 F.3d at 515 (citation, internal quotation marks, and alteration omitted).

Additionally, if an employee "engages in behavior that is unacceptable in the workplace," such behavior "disqualifies her from continued employment and justifies her discharge," even if the behavior is caused by a mental illness. *Felix v. Wis. Dep't of Transp.*, 828 F.3d 560, 568 (7th Cir. 2016) (citation and internal quotation marks omitted)). Put simply, the ADA "does not require an employer to retain a potentially violent employee." *Id.* (citation omitted). "Such a requirement would place the employer on a razor's edge—in jeopardy of violating the [ADA] if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone." *Id.* (citation omitted). Thus, when a "disruptive incident" occurs in the workplace suggesting that an employee may be suffering from a mental illness that interferes with her ability to perform her job duties, "an employer may seek a professional assessment of the likelihood of an employee's unacceptable behavior recurring before it decides . . . whether the employee is qualified for continued employment." *Id.* at 570.

Applying those principles here, Defendant is entitled to summary judgment on Plaintiff's ADA claim. Plaintiff acknowledged at his deposition that he refused to undergo a fitness-for-duty exam because he believed the request was "not justified." (R. 88-1, Pl.'s Dep. Tr. at 47.) He also made no attempt to return to his own doctor to obtain a fitness-for-duty clearance because, in his view, "[t]here was no need" to do so. (*Id.* at 75.) Notwithstanding Plaintiff's subjective assessment of his own mental health, the record shows that Defendant had a legitimate basis for asking him to undergo a fitness-for-duty exam. The undisputed facts show that as of November

2013, Defendant was aware that Plaintiff had taken an extended leave of absence less than a year

earlier for mental health reasons, and that as of that time, he was not any medications. (R. 87,

Def.'s Facts ¶ 7; R. 91-3, Doctor's Note at 159; R. 88-1, Pl.'s Dep. Tr. at 60-61; R. 88-2,

Hawthorne Meeting Notes at 6-7; R. 91-3, Pl.'s Timeline at 10.) Several of Plaintiff's co-workers

reported witnessing him engage in unusual or aggressive behavior in recent months, and

Plaintiff's immediate supervisor, Garcia, was visibly crying and trembling when she reported a

recent incident involving Plaintiff. (R. 87, Def.'s Facts ¶¶ 19-22; R. 88-2, Meeting Notes at 25-

26; R. 88-2, Zhang Email at 16.) Although Plaintiff believes that Garcia was faking, and that his

coworkers' accounts were inaccurate or took his actions out of context, the question is not

whether Defendant's concerns were accurate, but whether they were honestly held. *See Felix*,

828 F.3d at 573-74 (affirming summary judgment for employer even though there was dispute

over whether employee was fit for duty, because the question was not whether employer was

"right or wrong" in its assessment, but whether it "honestly conclude[d]" that employee's

behavior, "and the risk of it recurring, warranted her discharge"). Even after conducting

extensive discovery, Plaintiff has provided nothing other than conjecture and speculation to

suggest that the stated reason for Defendant's actions was pretext for unlawful disability

discrimination. To the contrary, the record—including the documents authored by and submitted

by Plaintiff—"paint[s] a consistent picture of genuine concern that [Plaintiff's] behavior was

uncharacteristic and adversely impacting [his] ability to perform [his] job." *Coffman*, 578 F.3d at

566.

Plaintiff's use of the word "eliminate" in the statement he gave to HR on November 13,

2013, shortly after his meeting with Hawthorne and Rodriguez, was particularly troubling. (*See*

R. 88-2, Pl.'s Statement at 29.) In that eight-page document, Plaintiff stated that "[e]liminating

the dividers" was a key concern for him, and he identified Garcia and Records as both being "Dividers." (*Id.* at 30.) Plaintiff's meaning might have been entirely innocent, but Defendant had a right to be concerned over whether Plaintiff posed a potential threat to his coworkers. *See EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995) ("[A] safe workplace is a paradigmatic necessity of operating a business."); *Painter v. Illinois Dep't of Transp.*, No. 13-3002, 2016 WL 3961720, at *6 (C.D. Ill. July 21, 2016) (concluding that an email sent by plaintiff stating that "[s]omething's dead alright" "may have been an attempt at humor as the Plaintiff testified," but "it was not unreasonable for the Defendant to treat the email as a threat"), *aff'd*, No. 16-3187, 2017 WL 6032504, at *8 (7th Cir. Dec. 6, 2017). Under these circumstances, the Court cannot conclude that the decision to ask Plaintiff to undergo a fitness-for-duty examination constituted unlawful discrimination under the ADA. *See Krocka*, 203 F.3d at 515 (observing that "[t]he steps taken to reassure an employer that an employee is fit for duty where there is a legitimate concern about an employee's ability to perform a particular job" are not proof of unlawful discrimination).

As for Plaintiff's termination, the record is clear that Plaintiff refused to cooperate in obtaining a fitness-for-duty exam for several weeks. Instead, he sent a series of emails that were rambling, disjointed, and combative. (*See* R. 91-5, Pl. Emails at 40-41, 56, 75-76.) Rather than cooperating with the employees who had been assigned to address his situation, he repeatedly made personal attacks on them and attempted to "escalate" his concerns to their superiors, including demanding a face-to-face meeting with the company's new CEO. (*See* R. 88-2, Pl.'s Emails at 17-28, 35, 37, 40-41, 56, 65, 75-76.) When that failed, he filed complaints with the company's "ethics" hotline complaining that he was being ignored. (R. 91-5, Ethics and Compliance Hotline Notes at 49-54.) It is true that in an email sent on January 22, 2014, Plaintiff

made a vague inquiry about "exactly what the fit for work exam consists of," but at that point Stein had already made the decision to terminate him. (R. 91-5, Stein Email at 85; R. 88-3, Stein Aff. ¶ 12.) Additionally, even in that email Plaintiff did not firmly commit to undergoing an exam, but instead asked for additional information so he could decide "if it is even fair for me to do." (R. 91-5, Pl. Email at 95.)

Under these circumstances, Defendant's decision to discharge Plaintiff did not violate the ADA, nor has Plaintiff identified such "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's stated justification as to suggest pretext. *Skiba*, 884 F.3d at 724; *see also Coffman*, 578 F.3d at 565 (rejecting claim that employer violated the ADA by referring plaintiff for an unnecessary psychological evaluation, where the referral was made after multiple co-workers reported that plaintiff "did not seem like herself" and her superior was concerned that "she had become guarded to the extent that he believes there was a possibility that she was suffering from paranoia"); *Painter*, 2016 WL 3961720, at *8 (granting summary judgment for employer on ADA claim where plaintiff was referred for fit-for-duty exam after other employees reported incidents involving her loud and aggressive behavior, which raised "legitimate concerns that Plaintiff's behavior could pose a threat"); *Dengel v. Waukesha Cty.*, 16 F. Supp. 3d 983, 997 (E.D. Wis. 2014) (finding that plaintiff's discharge did not violate the ADA where plaintiff failed to obtain fitness-for-duty clearance precipitated by his employer's legitimate concerns about his mental health, because "it was [plaintiff] who refused to cooperate with [his employer's] expectations . . . and who ultimately caused his own termination"). For these reasons, Defendant is entitled to summary judgment on Plaintiff's ADA claim.

## II.    Retaliation

Plaintiff's remaining claim is that he was terminated for filing an EEOC complaint in violation of Title VII's anti-retaliation provision. (R. 38, Am. Compl. ¶¶ 22-31.) Defendant argues that this claim fails because Plaintiff has not come forward with sufficient evidence to establish a causal connection between his EEOC complaint and his discharge. (R. 86, Def.'s Mem. at 14-17.)

To succeed on a claim of retaliation, "a plaintiff must demonstrate that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018). To prove causation, the plaintiff must prove that the employer's "desire to retaliate was the but-for cause of the challenged employment action." *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014) (citation omitted). Speculation is insufficient, and instead the plaintiff "must produce facts which somehow tie the adverse decision to the . . . protected action[.]" *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). An employee cannot "avoid summary judgment by merely claiming that a jury could disbelieve the employer's reason." *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002).

There is no question that filing a complaint of gender discrimination with the EEOC, as Plaintiff did, constitutes protected activity within the meaning of Title VII. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017). There is also no question that Plaintiff's termination constitutes an adverse employment action. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016). But Defendant argues, and the Court agrees, that Plaintiff fails on the causation prong. (*See* R. 86, Def.'s Mem. at 14-17.) Plaintiff offers a significant amount of speculation and conjecture, but has not come forward with any admissible

evidence to link his termination to his EEOC charge. As outlined above, Defendant had a legitimate basis for being concerned about Plaintiff's ability to function appropriately in the workplace, and his failure to cooperate with the evaluation process for nearly eight weeks provided a legitimate reason to fire him. *See Dengel*, 16 F. Supp. 3d at 998 (granting summary judgment for employer on retaliation claim where employer "made it clear, time and again, that failure to participate in EAP counseling and receive a return to work authorization would result in termination," and plaintiff "exhausted his leave without providing the necessary documentation, thus entirely justifying his termination"); *Bottoms v. Ill. Dep't of Human Servs.*, No. 03 C 1881, 2007 WL 772895, at *10 (N.D. Ill. Mar. 9, 2007) (granting summary judgment on plaintiff's retaliation claim where plaintiff refused to take fitness-for-duty examination as directed, which provided a legitimate basis for her termination separate and apart from her EEOC complaint).

Plaintiff devotes a significant portion of his filings to attacking Garcia's integrity, arguing at length that she falsified information about her education and violated company policies, among other improprieties.[8] (*See, e.g.*, R. 91-3, Pl.'s Narrative at 12-65; R. 91, Pl.'s Resp. at 3-27.) Plaintiff argues that Defendant was "only interested in retaliating against [him] for reporting

---

[8] Plaintiff argues that Garcia had a history of mistreating male employees, (R. 91-3, Pl.'s Narrative at 54-55), but this argument misses the mark, because he does not actually assert a gender discrimination claim in his complaint. (*See* R. 38, Am. Compl.) To the extent he believes this supports his retaliation claim, the Court disagrees. Plaintiff claims that Garcia treated another former employee, Tom O'Donnell, in a similar fashion by "running to HR" and "telling on him" for allegedly acting "violent" during a meeting. (R. 88-1, Pl.'s Dep. Tr. at 52-53.) Plaintiff's own account of what happened between O'Donnell and Garcia is hearsay, and O'Donnell's sworn testimony did not support Plaintiff's account. (R. 91-7, O'Donnell Dep. Tr. at 17, 21-23.) O'Donnell, who left the company in June 2010, testified at his deposition that he was never called into HR and had no knowledge of Garcia ever reporting him for misconduct. (*Id.* at 21-23.) Plaintiff also described Garcia's alleged mistreatment of another former employee, Jason Berzanski, (R. 91-3, Pl.'s Narrative at 55-56), but he has not presented an affidavit or testimony from Berzanski himself, and much of what he has submitted is inadmissible hearsay. *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996) (holding that plaintiff's "own recitation" of events involving her co-workers could not be considered on a motion for summary judgment, where plaintiff "did not depose the co-workers . . . or otherwise secure admissible evidence to support these incidents"). As for the incidents Plaintiff claims to have personally witnessed, they involved Garcia making fun of Berzanski or calling him names. (*See* R. 91-3, Pl.'s Narrative at 55-56.) While certainly regrettable, this is not the same type of conduct Plaintiff claims he was subjected to by Garcia. In short, this evidence fails to create a genuine issue of fact on Plaintiff's retaliation claim.

[Garcia's] unethical management." (R. 91, Pl.'s Resp. at 19.) However, to prove unlawful retaliation for purposes of Title VII, Plaintiff must link his termination to his complaint about *gender discrimination. See Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1614 (2017). As the Seventh Circuit has explained, to succeed on a retaliation claim under Title VII, the plaintiff "must show that he engaged in a statutorily protected activity," which "requires more than simply a complaint about some situation at work, no matter how valid the complaint might be." *Id.* "To be protected under Title VII, his complaint must have indicated the discrimination occurred because of sex, race, national origin, or some other protected class." *Id.* (citations and internal quotation marks omitted)). Thus, Plaintiff could not succeed on his retaliation claim even if he proved that Defendant fired him for raising complaints about Garcia being "unethical." Plaintiff's argument that Defendant was trying to silence his allegations of wrongdoing by Garcia also finds little support in the record. Instead, the record shows that Defendant investigated the allegations Plaintiff raised about Garcia, as a result of which she and two other employees were ultimately fired. (R. 91-4, HR Incident Forms at 20-31; R. 91-6, Gandia Dep. Tr. at 30.) "In the end, plaintiff's proffered theory is too divorced from the factual record to create a genuine issue of material fact." *Skiba*, 884 F.3d at 721.

In addition, the record reflects that Garcia was not the decisionmaker with respect to any adverse employment action taken against Plaintiff. Instead, it was Aimi who made the decision to have Plaintiff escorted out of the workplace and placed on leave, and Stein who made the decision to terminate him. (R. 87, Def.'s Facts ¶ 31; R. 88-3, Stein Aff. ¶¶ 12-13; R. 91-5, Aimi Letter at 9-10.) Garcia's conduct, as a non-decisionmaker, has very little relevance. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004) ("The analysis of pretext focuses only on what the *decisionmaker* . . . sincerely believed." (emphasis added)); *Davis v. Con-Way*

*Transp. Cent. Express, Inc.*, 368 F.3d 776, 788 (7th Cir. 2004) (holding that wrongful actions of non-decisionmakers "fail[ed] to demonstrate a causal connection between [the plaintiff's EEOC] charges and his termination"); *Sheppard v. Vill. of Glendale Heights*, No. 11 C 01044, 2014 WL 1227025, at *5 (N.D. Ill. Mar. 25, 2014) (finding that comment made by non-decisionmaker was irrelevant to proving that employer was motivated by discriminatory purpose in terminating plaintiff).

It is true that Garcia's report to HR played a role in the initial decision to have Plaintiff escorted out of the building and place on leave. (R. 87, Def.'s Facts ¶¶ 27-30.) However, the record shows that HR staff interviewed several other employees before taking this step, and Plaintiff's coworkers confirmed that, in their view, Plaintiff had been acting unusually or aggressively in recent months. (R. 87, Def.'s Facts ¶¶ 19-22; R. 88-2, Meeting Notes at 25-26.) Plaintiff himself gave HR an eight-page statement he had written stating that one of his goals was to "eliminate" the "dividers" in the company, which in his view included Garcia. (R. 88-2, Pl.'s Statement at 29-30.) This certainly gave Defendant cause for concern, independent of anything Garcia might have said. Stein also personally interacted with Plaintiff for several weeks while he was on leave, during which time he sent her and others in the company (including the CEO) a series of disjointed and troubling emails. (R. 91-5, Pl. Emails at 31-32, 56, 65, 75.) As a result of his failure to undergo a fitness-for-duty exam in a timely fashion, coupled with changes that were taking place within the company during this period, Plaintiff was ultimately terminated in January 2014. (R. 88-3, Stein Aff. ¶¶ 12-13.) There is nothing in the record to suggest that Garcia played any role in these events and, in fact, she herself had been terminated a few weeks earlier. (R. 91-4, Garcia Termination Letter at 47; *id.*, HR Incident Forms at 23-31.) For these reasons, Plaintiff's assertions about Garcia do not defeat summary judgment.

Plaintiff also points to the release Defendant wanted him to sign in order to obtain a severance package, which provided in part that Plaintiff would withdraw his EEOC complaint. (R. 91-3, Release at 141-47.) He believes that this in itself was unlawful, (R. 91, Pl.'s Resp. at 24), but that is not accurate. The Seventh Circuit has held that conditioning discretionary benefits on the withdrawal of an EEOC charge or a promise not to file charges with the EEOC does not constitute evidence of retaliation. *EEOC v. CVS Pharm., Inc.*, 809 F.3d 335, 341 (7th Cir. 2015) ("Several circuit courts, including ours, have held that conditioning benefits on promises not to file charges with the EEOC is not enough, in itself, to constitute 'retaliation' actionable under Title VII."); *see also EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 452 (3d Cir. 2015) (finding "no legal authority for the proposition that an employer commits an adverse action by denying an employee an unearned benefit on the basis of the employee's refusal to sign a release" of discrimination claims and finding "significant support . . . for the opposite conclusion" ); *EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490, 499 (6th Cir. 2006) (holding that a severance agreement that conditions severance pay on a promise not to file a charge with the EEOC does not violate Title VII's anti-retaliation provisions). In short, his argument is unpersuasive.

Plaintiff also points to the fact that Defendant moved up the deadline for him to obtain a fitness-for-duty exam, originally telling him he had until January 31, 2014, to decide what he wanted to do, but then informing him on January 22, 2014, that his return to work was "no longer an option." (R. 91-5, Stein Email at 85.) He attributes this change of course to the filing of his EEOC complaint on January 2, 2014. (R. 91, Pl.'s Resp. at 16-17.) It is true that suspicious timing can provide circumstantial evidence of unlawful retaliation. *See Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017). Nevertheless, "temporal proximity, without additional evidence, is rarely sufficient to establish a causal connection." *Bagwe*, 811 F.3d at 888 (citation

and internal quotation marks omitted). Additionally, there are "no bright-line rules to apply when considering the temporal proximity of adverse actions to protected activities because it is a fact-intensive analysis." *Hicks v. Forest Pres. Dist. of Cook Cty.*, 677 F.3d 781, 789 (7th Cir. 2012).

Given the circumstances of this case, the timing of Plaintiff's discharge was not particularly suspicious. Plaintiff filed his EEOC charge on January 2, 2014, and at that point he had been out on leave for more than a month, barraging the company with emails while steadfastly refusing to undergo a fitness-for-duty exam. After Plaintiff filed his EEOC charge, Stein and others continued to engage with him for more than two weeks, urging him to complete the fitness-for-duty evaluation so that he could return to work. (*See* R. 91-5, Barber Emails at 41, 62; *id.*, Stein Email at 67.) The emails he sent in response—to Stein, the CEO, and other high-level employees—were troubling and combative. (*See* R. 91-5, Pl. Emails at 40-41, 56, 75-76.) Plaintiff's email sent to Stein on January 17, 2014, was particularly concerning. Among other things, Plaintiff accused Garcia of "nearly kill[ing] me," and stated that he wanted to "solve this problem once and for all by any means necessary." (*Id.* at 76.) He repeatedly referred to himself in the third person (something he had not done in prior emails) and closed with an incoherent paragraph about something he referred to as "ONE Hero." (*Id.*) Nowhere in that email did he agree to undergo a fitness-for-duty exam. (*See id.*) The fact that Stein determined at that point that the interactive process had been exhausted does not prove unlawful retaliation. *See Bagwe*, 811 F.3d at 890 (affirming summary judgment for employer on retaliation claim where the employer's "rationale for terminating [plaintiff] has been consistent and finds support in the record"); *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 800 (7th Cir. 2014) (affirming summary judgment for employer on retaliation claim where plaintiff's arguments regarding

suspicious timing and pretext relied on "unbridled speculation," and the record revealed a history of performance issues prior to her termination).

Additionally, the record shows that Plaintiff's department was undergoing significant changes during this period as a result of the recent merger with OfficeMax, resulting in a change in leadership and the elimination of several positions.[9] (*See* R. 91-4, Garcia Termination Letter at 47; *id.*, HR Incident Forms at 23-31; R. 91-6, Gandia Dep. Tr. at 30; R. 88-3, Stein Aff. ¶¶ 12-13; R. 91-2, Pl.'s Resp. to Def.'s Facts ¶ 4.) These facts were communicated to Plaintiff even before he filed his EEOC charge. (R. 87, Def.'s Facts ¶ 45.) The changes occurring within the company provide another legitimate reason for Plaintiff's discharge separate and apart from his EEOC complaint. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 968 (7th Cir. 2012) (affirming summary judgment for employer on retaliation claim where company merger resulted in elimination of plaintiff's position, and thus record showed that plaintiff's termination was not based on his protected speech, but on "wholly unrelated, intervening events"). In short, Plaintiff has not sufficiently linked his termination to his EEOC charge, nor has he created a genuine dispute over whether Defendant's stated justification was pretextual. Based on the record, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

---

[9] Plaintiff argues that certain employees in his department—Song Nie, John Xiao, Neelima Mylavarapu, Kavitha Kannan, and Zhang—were allowed to remain employed after the merger, as evidenced by the fact that he saw them all eating lunch together at a restaurant sometime in November 2014. (R. 91, Pl.'s Resp. at 9.) Even accepting Plaintiff's account as true, this evidence does not establish pretext. Instead, these facts are fully consistent with Aimi's statement in December 2013 that the company's headquarters would likely be moving in 12 to 18 months, which would have been subsequent to the time Plaintiff claims to have seen his former coworkers together. (R. 87, Def.'s Facts ¶ 45.) Additionally, Stein did not tell Plaintiff that all employees in his department were being let go, only that there was "new leadership" and that "much of the work" of the IT department was being "transition[ed] from Naperville to Florida." (R. 91-5, Stein Email at 85.) Plaintiff has not provided any evidence to suggest that Stein did not honestly believe this statement at the time it was made, which he would have to do to establish pretext. *See Skiba*, 884 F.3d at 724. To the contrary, the record suggests that her statement was truthful. As stated above, at least three employees from Plaintiff's department, including his immediate supervisor, were let go during this period. (R. 91-4, Garcia Termination Letter at 47; *id.*, HR Incident Forms at 23-31; R. 91-6, Gandia Dep. Tr. at 30; R. 88-3.) Plaintiff himself makes reference to Baugh also leaving during this period, although the circumstances surrounding his departure are not disclosed in the record. (*See* R. 91, Pl.'s Resp. at 24.)

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (R. 85) is GRANTED. The clerk of court is DIRECTED to enter final judgment in favor of Defendant and against Plaintiff.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: April 12, 2018**